# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

ROCKY H. CAIN                                    CIVIL ACTION NO. 03-1372

VERSUS                                           JUDGE ROBERT G. JAMES

TRANSOCEAN OFFSHORE DEEP             _____MAG. JUDGE KAREN L. HAYES
WATER DRILLING, INC., ET AL.

## RULING

This case arises from Plaintiff Rocky H. Cain's ("Cain") injury aboard a rig in the Gulf of
Mexico. Plaintiff brought suit against his employer, Transocean Offshore USA Inc., and its
predecessor, Sedco Forex Corporation (collectively "Transocean"), under the Jones Act, 46 U.S.C.
§ 688, and general maritime law.

On March 16, 2005, twenty days before trial, Transocean filed a Motion for Leave to File
Motion for Summary Judgment and for Expedited Hearing. As the basis for that motion,
Transocean relied on a March 11, 2005 ruling by United States District Judge Ivan Lemelle of the
Eastern District of Louisiana in a maritime case involving the same rig at issue in this case.

After reviewing the motion and the opposition memorandum filed by Cain, this Court
found good cause to continue the trial and order mediation, to be completed by the end of April
2005. The parties notified the Court in May 2005 that mediation was unsuccessful. Accordingly,
on May 6, 2005, the Court issued a minute entry instructing the parties to brief certain issues by
May 31, 2005. The Court also re-set the bench trial in this matter for August 16, 2005.

Briefing is complete, and the Court is now ready to rule. For the following reasons,

Transocean's Motion for Summary Judgment [Doc. No. 75] is DENIED.

## I.    FACTS AND BACKGROUND

In June 1996, Cain was hired as a driller by Sonat Offshore USA Inc., which later became part of Transocean.  He was assigned to the rig *Amirante*.  Although his job assignment later changed to toolpusher, he continued to work aboard the *Amirante* until March 1, 2000.

On March 1, 2000, Cain was assigned to work as a toolpusher at the "Cajun Construction Site" in Singapore for construction of the *Cajun Express*.  Cain was part of the drilling crew, which had begun to arrive at the construction site in the first half of 1999.  *See* Doc. #75, Exhibit A, Deposition of Daniel Haslam, at 12 (hereinafter "Exh. A, at __").  It was contemplated that drilling crew members, such as Cain, would stay with the *Cajun Express* after construction was complete or would be reassigned to one of its sister rigs.  Exh. A, at 16.

The *Cajun Express* is now a fifth generation,[1] semisubmersible drilling rig.  Exh. A, at 7.  It was built for the purpose of drilling for oil and gas.  Exh. A, at 12.  The rig is constructed so that two attached pontoons, which are two hundred feet long, float below the waves and help prevent it from being affected by the motion of the waves.[2]  Exh. A, at 7.  Using its dynamic positioning system, the *Cajun Express* is capable of deepwater drilling.  The system uses four thrusters located on the four sides of the rig to maintain the rig's position over a drill site.

The *Cajun Express* was constructed in the PPL Shipyard in Singapore.  According to

---

[1]"Fifth generation" refers to the fact that the *Cajun Express* is the most modern drilling rig available with a high level of automation.  At the time of Haslam's deposition, there were only ten fifth generation rigs in the world.  Exh. A, at 7.

[2]The pontoons apparently do not prevent all motion because Haslam later testified that "[t]he rig moves around due to the waves."  Exh. A, at 27.

Transocean's design engineer Daniel Haslam, "PPL w[as] required to build the rig, install the drilling equipment in its final working position, after which it became Transocean's rig." Exh. A, at 19. PPL was not responsible for commissioning the rig to make sure that it could perform the function of drilling for oil and gas. Exh. A, at 23. During the first half of 2000, the *Cajun Express* underwent sea trials. Exh. A, at 14. The trials confirmed that the vessel's propulsion system worked properly, the vessel was water tight, and the vessel was capable of moving about the oceans under its own power. Exh. A, at 13-14, 20-21.

Following the sea trials, the rig was loaded out to sail over to Gulf of Mexico. When the *Cajun Express* left Singapore, the pontoons, columns, deck box (including the warehouse), drill floor, derrick, thrusters, and all drilling equipment were in place. Exh. A, at 8-13, 23. At that time, the *Cajun Express*'s engines and thrusters were working properly. Exh. A, at 21-22. Although the rig was capable of sailing under its own power, tugboat assistance was used in the voyage to the Gulf of Mexico. Exh. A, at 14; *see also* Doc. #75, Exhibit C, Deposition of Daniel Haslam in *Hyman v. Transocean Offshore Deepwater Drilling, Inc.* ("*Hyman*"), Civ. Action No. 03-2959, Eastern District of Louisiana, at 21 (hereinafter "Exh. C, at ___"). During the trip, workers continued to build the rig and commission certain aspects of the rig. Exh. A, at 14.

When the *Cajun Express* arrived in the Gulf of Mexico in August 2000, it was moored off the coast of Grand Isle, Louisiana. Exh. A, at 15, 26. At that time, the *Cajun Express* was capable of drilling for oil and gas under certain limited weather conditions, even though certain pipe handling equipment had not yet been installed. Exh. A, at 27-28; *see also* Exh. A, at 41 (The *Cajun Express* could "perform its intended purpose without [pipe handling equipment, known as riser tailing arms and conductor tailing arms]," but only in "very limited weather conditions that

were not to [Marathon Oil Company's] approval."); *cf.* Doc. #75, Exh. C, at 17 (stating that the *Cajun Express* was "definitely not" capable of performing its intended function of being a mobile offshore drilling unit on October 30, 2000). After its arrival in the Gulf, the pipe handling equipment, used to move pipe from one location to another, was installed.[3] The vessel's blisters were also installed. Exh. A, at 15. Blisters are large steel boxes fabricated and welded to the outside of each column to increase a vessel's buoyancy. Additionally, repairs were made to one of the thrusters which had leaked in the trip from Singapore.[4] Exh. A, at 16, 24-25.

During this time, Cain continued to work as a toolpusher. He was "second in command" behind the senior pusher and was required to "stay up on the drill floor and take care of the drilling activities." Doc. #75, Exhibit D, Deposition of Rocky Cain, at 14-15 (hereinafter "Exh. D, at __ "). He supervised the drill crew and made sure that all employees under his supervision followed company safety policies. Exh. D, at 15.

On September 10, 2000, Cain was working on the drill floor of the *Cajun Express*. On that date, the blisters were still being installed, and the drilling systems were not yet commissioned. Exh. A, at 17. However, the rig had actually run some pipe. Exh. D, at 34. During his shift, Cain left the drill floor to retrieve a part from the warehouse, which is a room located inside the vessel.

---

[3]The Court has relied on two depositions of Daniel Haslam, the design engineer for the *Cajun Express*. Mr. Haslam's deposition was taken in this case on December 6, 2004, and in the *Hyman* case on January 31, 2005. As noted by Judge Lemelle, the Court may properly rely on both depositions because Haslam's testimony was based upon personal knowledge and sets forth admissible facts, and Haslam, who currently resides in Aberdeen, Scotland, will not be made available for trial. *See* Fed. R. Evid. 804(b)(1); *see also Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049 (9th Cir. 2001).

[4]In his Order and Reasons, Judge Lemelle has provided a more detailed account of the *Cajun Express*'s activities. While this Court does not believe additional facts are necessary for its analysis, this Court agrees with Judge Lemelle's account of the facts.

The warehouse is approximately 100 feet long and has aisles with shelving on each side. I-beams cross the ceiling, and light fixtures are immediately adjacent to the I-beams. The light fixtures protrude below the bottom of the I-beams. Because the ceilings inside the warehouse are only 5 ½ feet high, and Cain is 6 feet 4 inches tall, he had to bend over as he walked down the aisle.

While walking in a bent position, Cain struck his head on a light fixture. Cain then experienced dizziness and significant pain in his neck. He was examined by the medic that day. The following day, Cain's neck was extremely stiff, and he had pain in his neck, right shoulder, and arm. Cain worked two more days until his regularly scheduled time off.

When he returned home, Cain was treated by Dr. Michael Hayward, who referred him to a neurosurgeon. The neurosurgeon recommended physical therapy, which Cain underwent.

Cain continued to work during this time.

In the first quarter of 2001, the *Cajun Express* traveled to the Walker Ridge location in the Gulf of Mexico in order to perform a test for Marathon Oil Company, using one of its old wells to demonstrate that the *Cajun Express* was capable of performing vital drilling functions. Exh. A, at 31-32. The *Cajun Express* successfully completed the test and began drilling operations in April or May 2001 when Marathon Oil Company "accepted the rig." Exh. A, at 29-30.

After the *Cajun Express* began drilling operations, Cain continued to work as a toolpusher until June 20, 2001. Around this time, he sought a second opinion from Dr. Bernie McHugh, a neurosurgeon. Dr. McHugh diagnosed him with a herniated disc and pain. At Dr. McHugh's recommendation, Cain underwent a cervical discectomy and fusion in September 2001.

On December 10, 2001, Dr. McHugh released Cain to return to work as a supervisor. Cain called Transcocean's Houston office to report his release. Three days later, Transocean office

personnel told Cain to report to The Fontana Center ("Fontana")[5] in Lafayette, Louisiana, for five days of "work hardening." Cain had been informed that his new assignment was to a drilling barge off the coast of Africa, but that he first had to complete the Fontana program.

Cain began the work hardening program at Fontana on January 14, 2002. On the second day of the program, Cain experienced elevated blood pressure and pain in his neck, chest, arms, and back. As a result, Fontana discontinued the program and sent him home.

On February 12, 2002, Cain returned to see Dr. McHugh. Cain contends that he received injuries at Fontana that resulted in his having to undergo a second lumbar surgery. Cain's surgery took place on March 30, 2005. During surgery, a blood clot caused Cain to lose 75-80% of the vision in his left eye.

## II.     LAW AND ANALYSIS

Any seaman who suffers an injury during the course of his employment may bring an action for damages under the Jones Act. 46 U.S.C. § 688. However, any person seeking protection as a seaman under the Jones Act must have an "'employment-related connection to a vessel in navigation.'" *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (quoting *McDermott Int'l v. Wilander*, 498 U.S. 337, 355 (1991)). The Supreme Court has established a two-prong test to determine seaman status. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id.* The seaman status inquiry is a mixed question of law and fact,

---

[5]Fontana is a third-party defendant in this case, but the allegations against it are not at issue for purposes of this summary judgment.

which is normally reserved for the trier of fact.  *See Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554 (1997); *see also Bouvier v. Krenz*, 702 F.2d 89, 90 (5th Cir. 1983) (citations omitted) (Summary judgment on seaman status is "rarely proper" and even "marginal cases should go to the jury.").  The issue of seaman status may be removed from the trier of fact if "the facts and law will reasonably support only one conclusion."  *Chandris*, 515 U.S. at 373.

In this case, Transocean argues that, at the time of Cain's injury, the *Cajun Express* was "not equipped, certified or capable of performing the function for which it was intended, to drill for oil and gas," but rather "was still under construction."  Doc. #75, Memorandum in Support of Motion for Summary Judgment, at 2.   Therefore, Transocean contends that, because the *Cajun Express* "was not a vessel in navigation at the time of the alleged September 10, 2000 injury, [Cain] cannot be considered a Jones Act seaman[,] and Summary Judgment should be granted."[6] *Id.*

In support of these contentions, Transocean cites the Court to the March 11, 2005 ruling by Judge Lemelle in *Hyman*.  In that case,  the plaintiff was employed aboard the *Cajun Express* as a subsea engineer responsible for building the subsea system on the rig.  He was working in this capacity when he was injured on October 25, 2000, over one month after Cain's injury.  The *Hyman* defendants moved for summary judgment, claiming that the plaintiff did not have seaman status when he was injured because the *Cajun Express* was under construction, and, thus, was not "in navigation" on that date.[7]   In his Order and Reasons, Judge Lemelle conducted a thorough

_____

[6]Transocean contends that Cain was a ship builder whose injury was covered by the Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. § 902.

[7]Defendants in *Hyman* also moved for summary judgment on a retaliatory discharge claim which is irrelevant to the issues before this Court.

analysis relying on Fifth Circuit precedent and ultimately concluded that "Hyman was not a seaman for purposes of the Jones Act because the vessel upon which he labored in a construction capacity was not a 'vessel in navigation' as that term is defined under controlling authority." *Hyman,* Order and Reasons, at 7.[8]

In his analysis, Judge Lemelle discusses Fifth Circuit precedent standing for the proposition that a vessel is not "in navigation" and thus an employee cannot show seaman status if the vessel is still under construction or has not yet begun performing its intended purpose. *See Hyman,* Order and Reasons, at 8 (citing and discussing *Garret v. Dean Shank Drilling Co.*, 799 F.2d 1007, 1009 (5th Cir. 1986), and *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 957 (5th Cir. 1971)). Judge Lemelle also cited to the decision of a sister district court in *Leonard v. Transocean*, 189 F.Supp.2d 627 (S.D. Tex. 2002), involving very similar facts, in which the court concluded that the rig was not in navigation at the time of the plaintiff's injury.

Immediately prior to Judge Lemelle's decision, however, on February 22, 2005, the Supreme Court issued a decision in *Stewart v. Dutra Constr. Co.*, 125 S. Ct. 1118 (2005), in which the Court considered the definition of "vessel" for purposes of the seaman status test under the Jones Act and for claims under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 902(3)(G). Judge Lemelle did not address the *Stewart* case in his Order and Reasons,[9] and the Fifth Circuit has not yet had the opportunity to address the effect of *Stewart*,

---

[8]While not controlling authority, Judge Lemelle's analysis has been given due deference by this Court.

[9] Hyman has since filed a motion for reconsideration on the basis of *Stewart.* That motion was denied on August 3, 2005. Judge Lemelle distinguished the *Stewart* case and found that the plaintiff still did not qualify for seaman status because he was employed as a ship builder, not as a Jones Act seaman.

if any, on its prior Jones Act decisions.

In a supplemental brief in opposition to Transocean's Motion for Summary Judgment, Cain argues that, under *Stewart*, there is no requirement that "a vessel had to be fully capable of fulfilling its intended mission before it could be considered a vessel for the purpose of seaman status." Doc. #84, Plaintiff's Supplemental Brief in Opposition to Transocean's Motion for Summary Judgment, at 2. While not expressly discussing the Fifth Circuit cases on ships undergoing construction, Cain points out that the *Cajun Express* was "clearly a 'watercraft practically capable of maritime transportation,'" and, in fact, "was a brand new, oceangoing vessel that had completed sea trials in Singapore several months earlier" and "had carried men and equipment across the oceans."

Transocean also filed a supplemental brief, again relying on Judge Lemelle's Order and Reasons and further arguing that *Stewart* is irrelevant to the facts in this case. Transocean again contends that the *Cajun Express* was never in navigation **for its intended purpose**, and, therefore, Cain was a ship builder at the time of his injury. Transocean further argues that *Stewart* is irrelevant because that decision concerns when a vessel "loses its already obtained status of a vessel rather than the time when a vessel under construction becomes a vessel for the first time." Doc. #86, Defendants' Memorandum of Law, at 15.

Having considered the Supreme Court's decision in *Stewart* and having evaluated its effect on Fifth Circuit precedent, the Court finds that the *Cajun Express* was a vessel in navigation at the time of Cain's alleged injury, and that Cain's claims against Transocean were properly brought under the Jones Act.

First, the Court is cognizant of the fact that the precise issue before the *Stewart* Court was

whether a dredge is a "vessel" under the LHWCA. *See* 125 S. Ct. at 1123-24. Nevertheless, the Court was clear that its analysis is equally applicable to the determination of seaman status under the Jones Act. Accordingly, this Court finds that *Stewart* is relevant to the determination of Plaintiff's seaman status in this matter.

In *Stewart*, the plaintiff was a marine engineer hired by Dutra Construction Company ("Dutra") to maintain the mechanical systems on a dredge called the *Super Scoop*. In a project known as the "Big Dig," the *Super Scoop* was being used to extend the Massachusetts Turnpike through a tunnel running beneath South Boston and Boston Harbor to Logan Airport. The *Super Scoop* was described as follows:

> The Super Scoop is a massive floating platform from which a clamshell bucket is suspended beneath the water. The bucket removes silt from the ocean floor and dumps the sediment onto one of two scows that float alongside the dredge. The Super Scoop has certain characteristics common to seagoing vessels, such as a captain and crew, navigational lights, ballast tanks, and a crew dining area. But it lacks others. Most conspicuously, the Super Scoop has only limited means of self-propulsion. It is moved long distances by tugboat. (To work on the Big Dig, it was towed from its home base in California through the Panama Canal and up the eastern seaboard to Boston Harbor trench). It navigates short distances by manipulating its anchors and cables. When dredging the Boston Harbor trench, it typically moved in this way once every couple of hours, covering a distance of 30-to-50 feet each time.

*Id.* at 1121-22.

One of the *Super Scoop's* scows, Scow No. 4, had suffered an engine malfunction. Stewart was on board Scow No. 4, feeding wires through an open hatch. *Id.* at 1122. At the same time, the *Super Scoop* was using its bucket to move the scow. *Id.* Unfortunately, the scow collided with the dredge, and the resulting jolt plunged Stewart headfirst through the hatch to the deck below, seriously injuring him. *Id.*

Stewart filed suit against Dutra in federal district court in Massachusetts, alleging

negligence under the Jones Act. Alternatively, he made a claim under the LHWCA, which authorizes covered employees to sue a vessel owner as a third party for an injury caused by the owner's negligence. Dutra moved for summary judgment on Stewart's Jones Act claim under First Circuit precedent "which held that 'if a barge . . . or other float's purpose or primary business is *not* navigation or commerce, then workers assigned thereto for its shore enterprise are considered seamen only when it is in actual navigation or transit' at the time of the plaintiff's injury." *Id.* (quoting *DiGiovanni v. Traylor Brothers, Inc.*, 959 F.2d 1119, 1123 (1st Cir. 1992)). Because the *Super Scoop*'s primary purpose was dredging rather than transportation, and it was stationary at the time of the injury, the district court granted Dutra's motion for summary judgment. On interlocutory appeal, the First Circuit affirmed the district court, finding that the *Super Scoop*'s primary function was construction, any navigation or transportation was incidental to this function, and the movement of the scow had no effect on Stewart's status as a seaman. *Id.* The First Circuit remanded to the district court for further proceedings.

Dutra then moved for summary judgment on Stewart's claim under the LHWCA. Dutra conceded that the *Super Scoop* was a "vessel" under the First Circuit's "more inclusive" definition for purposes of the LHWCA. Nevertheless, Dutra argued that it was entitled to summary judgment because any negligence was committed in its capacity as employer, not vessel owner. *Id.* at 1122-23. The district court agreed and granted Dutra's motion for summary judgment. The First Circuit again affirmed.

The Supreme Court granted certiorari "to resolve confusion over how to determine whether a watercraft is a 'vessel' for purposes of the LHWCA." *Id.* at 1123. The LHWCA and the Jones Act are "complementary regimes that work in tandem: The Jones Act provides tort

remedies to *sea*-based maritime workers [i.e., seamen], while the LHWCA provides workers' compensation to *land*-based maritime employees." *Id.* The Jones Act is unusual in that the term "seaman" is not defined in the Act itself. Instead, seaman status is guided by "'the maritime law backdrop against which Congress enacted the Jones Act,'" *Id.* at 1123 (quoting *Chandris*, 515 U.S. at 354), and by the LHWCA's exception from coverage of "'a master or member of a crew of any vessel.'" *Id.* (quoting 33 U.S.C. § 902(3)(G)).

In previous decisions, the Supreme Court has addressed the definition of "seaman" in terms of his relationship "to a vessel in order to be a 'master or member' of its crew," but in *Stewart*, the Supreme Court addressed the "other half of the LHWCA's equation: how to determine whether a watercraft is a 'vessel.'" *Id.* at 1124. Because the term "vessel" is not defined in the LHWCA, the Supreme Court turned to the statutory definition Congress did provide: § 3 of the Revised Statutes of 1873 defines "vessel" to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. Congress has instructed that this default definition of vessel is to be used "throughout the U.S. Code 'unless the context indicates otherwise.'" 125 S. Ct. at 1124 (quoting 1 U.S.C. § 1). Finding the § 3 definition consistent with the general maritime law, that the definition had been virtually unchanged since 1873, and that the definition was settled at the time Congress enacted the Jones Act and the LHWCA in the 1920's, the Supreme Court unanimously concluded that § 3 provides the "controlling definition" of vessel throughout all sections of the LHWCA. *Id.* at 1124, 1129.

Having held that § 3 provides the definition of vessel, the Supreme Court then reviewed the First Circuit's test for seaman status to determine if it was compatible with that definition. The Supreme Court concluded that "[n]either prong of the [First Circuit's] test [was] consistent with

the text of § 3 or the established meaning of the term 'vessel' under the general maritime law." *Id.* at 1127-28.

First, the Supreme Court rejected the First Circuit's classification of vessels based on their "primary business." As long as a watercraft is "used, or capable of being used, as a means of transportation on water," the Supreme Court explained that it qualifies as a vessel, whether or not it is used "*primarily* for that purpose." *Id.* at 1128. Second, relying on its previous holding in *Chandris,* 515 U.S. 347, the Supreme Court explained that "a watercraft need not be in motion to qualify as a vessel under § 3," and that the "in navigation" requirement was not meant to be interpreted apart from the rest of the definition of § 3. *Id.* at 1128. Accordingly, the Supreme Court held that "[u]nder § 3, a 'vessel' is any watercraft practically capable of maritime transportation, **regardless of its primary purpose** or state of transit at a particular moment." *Id.* at 1129 (emphasis added). Because "the *Super Scoop* was engaged in maritime transportation at the time of Stewart's injury, it was a vessel within the meaning of 1 U.S.C. § 3." *Id.*

Applying *Stewart*, this Court concludes that the *Cajun Express* was a vessel in navigation at the time of Cain's alleged injury. Not only was it capable of being used as a means of transportation on water, but it had provided a means of transportation on water in Singapore when it completed its sea trials and en route from Singapore to the Gulf.

Transocean argues that *Stewart* involved a watercraft that was already a vessel, but had been temporarily taken out of transit for repairs, while this case involves a rig that had never become a vessel at the time of Cain's injury. However, Transocean's argument has been foreclosed by *Stewart.* The Supreme Court stated that it did not intend for the "'in navigation' requirement [to stand] apart from § 3, such that a 'vessel' for § 3 purposes might nevertheless not

13

be a 'vessel in navigation' for purposes of the Jones Act or the LHWCA." *Id.* at 1128. To accept Transocean's argument, the Court would have to conclude that Cain was not a member of the crew of a vessel because the *Cajun Express* was not a vessel in navigation **for its intended purpose** at the time of his injury. While such an argument was valid under the Fifth Circuit's precedent prior to *Stewart,* the Court does not believe that the precedent can stand scrutiny under the Supreme Court's analysis.

A review of the two Fifth Circuit cases principally relied upon by Transocean reveals their inconsistencies with *Stewart.* In *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955 (5th Cir. 1971), the plaintiff was injured during a ship's final sea trials. After additional "construction activities and procedures," the ship was delivered to and accepted by the Coast Guard a month later. *Id.* at 957. Plaintiff brought a Jones Act claim against his employer, the ship builder. The Fifth Circuit concluded that the plaintiff could not prevail on his Jones Act claim because the ship was not a vessel in navigation at that time of his injury, and, therefore, he was not a seaman. The *Williams* Court explained that the vessel must be "in navigation" at the time of the employee's injury. *Id.* at 958. The "term 'in navigation' means 'engaged in an instrument of commerce and transportation on navigable waters.' . . . [F]or a public non-merchant vessel, that would mean engaged in her expected duties as a vessel on navigable waters." *Id.* (citing Norris, LAW OF SEAMEN, § 664, p. 802; *Carumbo v. Cape Cod, S.S. Co.*, 123 F.2d 991 (1st Cir. 1941); *West v. United States*, 361 U.S. 118 (1959)). The Fifth Circuit concluded that a "ship builder's worker, construction hand or engineer assisting in the building and ultimate commissioning of a launched but uncompleted vessel floating or maneuvering in navigable waters is not a seaman." *Id.* (citation omitted). Stated another way, the Fifth Circuit ruled that "an incompleted vessel not yet

delivered by the builder" is not a ship and cannot be a vessel in navigation; therefore, plaintiff could not establish his status as a seaman.

The Fifth Circuit affirmed and expanded its holding in *Williams* fifteen years later in *Garret v. Dean Shank Drilling Co., Inc.*, 799 F.2d 1007 (5th Cir. 1986). Garret was hired as a roustabout on a barge. *Id.* at 1008. Initial construction was performed in Houma, Louisiana, and the barge (consisting of a hull and flat deck only) was delivered to Harvey, Louisiana. *Id.* There, the barge was moored in a canal and all the remaining structures, fixtures, and appurtenances were added to make it an oil and gas drilling rig. *Id.* The barge was afloat during this work and was turned two or three times, so that equipment could be placed on it. *Id.* At the time the plaintiff was injured, the hull still lacked crew's quarters, kitchen, derrick, and navigation lights, and it was not completed until two months after the plaintiff's injury. *Id.* The Fifth Circuit first cited *Williams*'s holding and then concluded the Dean Shank barge "was not in navigation **for its intended purpose**" and stated that the "crucial factor in *Williams* was not that the ship had not been delivered to the owner,[10] but that the very activity in which it was engaged, sea trials, showed that it was not in use for its intended purpose." *Id.* at 1009 (emphasis added).

A close reading of *Stewart* leaves this Court no choice but to conclude that the grafting of the "in navigation for its intended purpose" requirement onto the § 3 definition is in conflict with the Supreme Court's analysis. The Court has examined the Fifth Circuit's vessel test and concludes that it, like the First Circuit test, is inconsistent with *Stewart*. First, the Court notes that

---

[10]The plaintiff had argued that his case was distinguishable from an earlier Fifth Circuit decision in *Hollister v. Luke Constr. Co.*, 517 F.2d 920 (5th Cir. 1975). In *Hollister*, the court found that the plaintiff was not a seaman because he was working on a bare-hull barge upon which a drilling rig and living quarters were being constructed, and the barge had not yet been delivered to its owner.

the Fifth Circuit has treated "in navigation" as an element of the seaman status test, separate from the vessel test. *See, e.g., Williams*, 452 F.2d at 958. This position was specifically rejected by the *Stewart* court: the Supreme Court did not mean for the "'in navigation' requirement [to stand] apart from § 3, such that a 'vessel' for § 3 purposes might nevertheless not be a 'vessel in navigation' for purposes of the Jones Act or the LHWCA." 125 S. Ct. at 1128.

Second, under the Fifth Circuit's test, a vessel can only be "in navigation" when it is "engaged in an instrument of commerce and transportation on navigable waters." *Williams,* 452 F.2d at 958. Again, the Supreme Court rejected any such requirement that a vessel be "an instrument of commerce and transportation," but rather limited the courts' inquiry to whether "the watercraft's use 'as a means of transportation on water' is a practical possibility or a theoretical one." 125 S. Ct. at 1128.

Likewise, there is no additional requirement under the Supreme Court test that a "nonmerchant vessel" be "engaged in its expected duties on navigable waters" or "in navigation for its intended purpose" at the time of the employee's injury. *See Williams*, 452 F.2d at 958; *Garret*, 799 F.2d at 1010. While the *Super Scoop* had been dredging prior to plaintiff's injury (i.e., engaged in its expected duties or in navigation for its intended purpose), the Supreme Court made no distinction as to whether a vessel has or has not begun its "intended" purpose, but relied solely on the § 3 definition and whether a vessel was capable of being used to transport equipment and workers over water.[11] 125 S. Ct. at 1128. There is no doubt that the *Cajun Express* did transport

---

[11]This Court has also considered the analogous Supreme Court case law on vessels undergoing repairs. In that situation, the Supreme Court has instructed that "'the focus should be upon the status of the ship, the pattern of repairs, and the extensive nature of the work contracted to be done.'" *Chandris*, 515 U.S. at 374 (quoting *West v. United States*, 361 U.S. 118, 122 (1959)). Renovations or repairs to a ship that are significant and major may take a ship out of

equipment and workers over water well prior to Cain's injury. Thus, the Court concludes that the *Cajun Express* was a vessel in navigation on September 10, 2000.

However, the Court's inquiry does not end at this point. The Supreme Court has instructed that a plaintiff must still meet the other prerequisites to qualify for seaman status under the Jones Act, providing some limitations to the § 3 definition. *Id.* at 1127. Any worker injured aboard a vessel must still be a master or member of its crew to be eligible for Jones Act status and must prove that (1) "his duties contributed to the vessel's function or mission," (2) he had a substantial connection in nature to that vessel, and (3) he had a substantial connection in duration to the vessel. *Id.*

There is no serious dispute that Cain had a substantial connection to the vessel, both in nature and duration, as he spent all of his work time aboard the *Cajun Express* as a toolpusher, and he was employed on the rig for one year and three months (nine months at the time of his injury). Rather, any dispute would center on the first requirement, whether his duties contributed to the vessel's function or mission.

However, Cain satisfies this first requirement as well. The Supreme Court has previously instructed that satisfying this prong of the seaman status test is relatively easy: the employee need only show that he "do[es] the ship's work." *Chandris,* 515 at 368. This category is "very broad" and includes "all who work at sea in the service of a ship." *Id.* (internal citations and quotation marks omitted). Here, Cain was never a land-based maritime worker. At all times during his employment on the *Cajun Express*, he worked as toolpusher, overseeing drilling activities,

---

navigation. *Id.* In this case, however, the vast majority of the construction taking place was for the purpose of outfitting the rig with state-of-the-art drilling equipment, and at all times it could still meet the § 3 definition of a vessel.

supervising the drill crew, and ensuring that Transocean's safety policies were followed. Thus, he did the rig's work while on board.

Finally, the Court notes that even if Cain's job title had been identified as "ship builder" or "ship repairman," occupations listed in the LHWA, it would not affect his status as a Jones Act seaman. The Supreme Court has specifically rejected the idea that occupations enumerated in the LHWA restrict an employee's remedies to that statute. *See Chandris*, 515 U.S. at 364 (citing *Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81 (1991)). Rather, it is an employee's "connection to the vessel" that is determinative. *Id.* (citing *Southwest Marine*, 502 U.S. at 89) (other citations omitted). Even employees "employed by a shipyard and who spend a portion of their time working on shore but spend the rest of their time at sea" may be Jones Act seaman. *Id.* The "Jones Act was intended to protect sea-based maritime workers, who owe their allegiance to a vessel." *Id.* at 376. Cain's connection to the *Cajun Express* was that of a member of the vessel, and he should be accorded seaman status.

Therefore, the Court finds that the *Cajun Express* was a vessel in navigation at the time of Cain's alleged injury, that Cain had a substantial connection in duration and nature to the rig, and that his duties contributed to the vessel's function or mission. The Court has jurisdiction over Cain's claims under the Jones Act.[12]

---

[12]Transocean admits that Cain's second alleged injury at Fontana relates back to his initial injury aboard the rig on September 10, 2000, so the Court's conclusion applies to both Cain's initial alleged injury and his second alleged injury.

## III.    CONCLUSION

For the foregoing reasons, Transocean's Motion for Summary Judgment [Doc. No. 75] is

DENIED.

MONROE,  LOUISIANA, this 12th  day of August, 2005.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE